**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**BECKLEY DIVISION**

**GREENBRIER HOTEL CORPORATION;**
**JAMES C. JUSTICE COMPANIES, INC.;**
**TWIN FIR ESTATES, LLC;**
**WILCOX INDUSTRIES, INC.; JUSTICE**
**LOW SEAM MINING, INC.; PLAYERS**
**CLUB, LLC; JUSTICE FAMILY**
**GROUP, LLC; GREENBRIER MEDICAL**
**INSTITUTE, LLC; GREENBRIER GOLF**
**& TENNIS CLUB CORPORATION;**
**THE GREENBRIER SPORTING CLUB**
**DEVELOPMENT CO., INC.; THE**
**GREENBRIER SPORTING CLUB, INC.;**
**TAMS MANAGEMENT, INC.;**
**BELLWOOD CORPORATION; OAKHURST**
**CLUB, LLC; JAMES C. JUSTICE, II;**
**CATHY L. JUSTICE; and JAMES C.**
**JUSTICE, III,**

     *Plaintiffs*,

     v.

**CARTER BANK & TRUST; CARTER**
**BANKSHARES, INC.; LITZ H. VAN DYKE;**
**PHYLLIS Q. KARAVATAKIS; MICHAEL R.**
**BIRD; KEVIN S. BLOOMFIELD; ROBERT**
**BOLTON; GREGORY W. FELDMAN; JAMES**
**W. HASKINS; JACOB A. LUTZ, III; E.**
**WARREN MATTHEWS; CATHARINE L.**
**MIDKIFF; CURTIS E. STEPHENS; and**
**ELIZABETH LESTER WALSH**

     *Defendants.*

**5:23-cv-00731**

Case No.

## **COMPLAINT**

### *Introduction*

1.    For more than 16 years, from 2001 through 2017, Plaintiffs enjoyed a remarkably

productive partnership with Defendant Carter Bank & Trust ("Carter," "Carter Bank," or the

"Bank"). Over that time, Carter became the primary lender for Plaintiffs' myriad businesses, generating millions of dollars a year in interest and profits for the Bank and allowing it to grow from a small institution to a significant regional presence in south and southwest Virginia. Central to the parties' success was the close business relationship between the Justice family (the owners of the entity Plaintiffs) and Carter founder Worth Carter ("Mr. Carter"), who recognized early on the opportunity to grow his bank by doing business with Plaintiffs. By Mr. Carter's death in April 2017, the loans between the Bank and the Justice companies had grown from an initial $4.5 million real estate loan in 2001 to a portfolio of $740 million in loans to the Justices' coal, agriculture, and hospitality businesses, and the interest that those loans generated provided most of the Bank's profit. The loans primarily were long-term—as long as 20 years—and had attractive interest rates of 4% to 5%.

2.    After Mr. Carter's death, the Justice family could have moved their business to another bank. But the Bank's new management swiftly moved to cut off that option, effectively seizing control of the Justice businesses and making it impossible for Plaintiffs ever to fully pay off their loans, with the goal of securing for the Bank a permanent stream of tens of millions of dollars in annual revenue. Carter has pursued that goal relentlessly—and unlawfully—ever since. Earlier this year, in fact, Carter unlawfully ██████████████████████████ ██████████████████████, preventing Plaintiffs from moving to a new lender. Carter's bad faith, breach of contract, and tortious and unlawful conduct represent the continuation of a scheme that Defendants have been carrying out since 2017, and they give rise to this action.

3.    Within weeks of Mr. Carter's death, Carter reneged on an agreement with Plaintiff Oakhurst to fully fund an approximately $64 million development of a world-class golf course and associated facilities and residences. Oakhurst had already borrowed $26 million from Carter to

begin the project before Carter breached its agreement to provide the remaining funding. After the breach, Oakhurst lacked the means to finish the project or pay off the $26 million it had borrowed, ensuring that Carter would continue to receive interest on that debt indefinitely.

4.      Shortly thereafter, in September 2017, Carter agreed to defer a monthly payment of approximately $1.9 million, then reneged on that agreement on the eve of the payment's due date, purposely inducing a technical default by Plaintiffs. Carter then exploited that technical default to force Plaintiffs into new loan terms vastly different from the ones that had been negotiated with Mr. Carter. This included, for some loans, replacing the loans' 20-year maturities with very short maturities that maximized Carter's control over Plaintiffs and made it impossible for Plaintiffs to operate their businesses effectively. Carter also increased Plaintiffs' interest rates and demanded sweeping releases of liability in an attempt to insulate itself from liability for its misconduct.

5.      In early 2020, Plaintiff Greenbrier Hotel Corporation settled litigation with various insurance companies arising from damage suffered in the devastating Greenbrier Valley floods of 2016. With no legal or contractual basis, Carter demanded that it receive the proceeds of that settlement, depriving Plaintiffs and their affiliates of cash that they intended to use to expand their businesses, which would have allowed them to generate revenue or new financing pay off their Carter loans.

6.      And in early 2023, 

.[1] The

---

[1] In an effort to conceal its wrongdoing, Carter Bank forced Plaintiffs to sign an Amended Amended and Restated Confidentiality and Nondisclosure Agreement ("NDA"), dated November 17, 2021, which purports to impose a broad prohibition on Plaintiffs' discussing Carter Bank's statements and actions even in a judicial proceeding brought to assert Plaintiffs' rights. The NDA is plainly unenforceable, but in an abundance of caution, Plaintiffs have

 By

████████████████, Carter deprived JLSM of profits of between $175 million and $300 million per year.

7.    These are only a handful of the many examples of bad faith and misconduct that have characterized Carter's strategy since April 2017. Because of Carter's significant control over their businesses, Plaintiffs have had little choice but to endure Carter's oppression until they can escape it by paying off their loans. ████████████████████████████████

████████████████.

8.    Through its actions, the Bank has conditioned its extension or servicing of credit to Plaintiffs upon their not obtaining other credit or services from a competitor, and has violated the laws of West Virginia and Virginia.  As a result of these and other unlawful actions by the bank since September 2021, Plaintiffs demand damages of not less than $1 billion.

* * *

9.    For their Complaint against Defendants Carter Bank & Trust, Carter Bankshares, Inc., Litz H. Van Dyke, Phyllis Q. Karavatakis, Michael R. Bird, Kevin S. Bloomfield, Robert Bolton, Gregory W. Feldmann, James W. Haskins, Jacob A. Lutz, III, E. Warren Matthews, Catharine L. Midkiff, Curtis E. Stephens, and Elizabeth Lester Walsh, Plaintiffs James C. Justice Companies, Inc., Twin Fir Estates, LLC, Wilcox Industries, Inc., Justice Low Seam Mining, Inc.,

---

provisionally redacted this public version of their Complaint and will move for leave to file the unredacted version under seal. Plaintiffs cannot predict what Carter Bank might claim is within the scope of the unenforceable NDA and thus have redacted broadly. Plaintiffs intend to file the full Complaint on the public docket as soon as the NDA's unenforceability is confirmed.

Greenbrier Hotel Corporation, Players Club, LLC, Justice Family Group, LLC, Greenbrier Medical Institute, LLC, Greenbrier Golf & Tennis Club Corporation, The Greenbrier Sporting Club Development Co., Inc., The Greenbrier Sporting Club, Inc., Tams Management, Inc., Bellwood Corporation, Oakhurst Club, LLC, James C. Justice, II ("Governor Justice"), Cathy L. Justice, and James C. Justice, III ("Jay Justice"), state as follows:

10.     The Justice family has been operating businesses since 1971.  Over that time, the Justice family has directly employed tens of thousands of people in various states in the country, including but not limited to Alabama, Kentucky, North Carolina, South Carolina, Tennessee, Virginia, and West Virginia.  Those operations have also resulted in secondary jobs for untold thousands of additional workers.  The Justices, and particularly Governor Justice, have been committed to the communities where these jobs are created.  That commitment includes giving to a variety of philanthropic concerns, but most notably giving to organizations that involve local youth.  In addition to donating to numerous schools, universities, and other organizations, Governor Justice has also given his time, coaching the Greenbrier East High School girls basketball team for the past 23 years and serving as the President of the Beckley, West Virginia Little League since 1992.  The Justices currently operate coal mining interests in West Virginia, Virginia, Kentucky, Tennessee, and Alabama; agricultural interests in West Virginia, Virginia, and South Carolina; and hospitality interests in West Virginia.  Today, the Justice family companies directly employ more than 2300 hard-working and highly valued people, and they indirectly support thousands more jobs.  Many of those employees have been employed by the Justices' business operations for decades.  The Justice organization is one of West Virginia's largest employers.

11.     Governor Justice and Mr. Carter met in 2001.  As Mr. Carter sought to expand his banking business, he actively pursued a commercial lending relationship with Governor Justice and his growing agricultural, mining, and hospitality operations.  Mr. Carter prided himself on making loans and developing banking relationships by building trust with his borrowers.  Between Mr. Carter and Governor Justice, a word and a handshake sufficed.  As Mr. Carter and Governor Justice embraced their financing relationship, they understood that the relationship was premised on mutual expectations of good faith and honor.

12.     Governor Justice knew that Mr. Carter's banks were not the biggest or most prestigious.  That said, consistent with his commitment to community, Governor Justice also saw the value of doing business with a trusted partner.  Governor Justice felt that he and his family business could rely on Mr. Carter and his reputation to treat them fairly.  And for nearly 16 years, that was absolutely true.

13.     While their financing relationship started in 2001 with a single real estate loan of approximately $4.5 million, Carter Bank had grown the relationship to over $775 million by the end of 2016.  The outstanding loan balance was paid down to approximately $740 million at the time of Mr. Carter's death in April 2017.  As of the date of this Complaint, the Justice companies have repaid nearly ███████ in principal since the death of Mr. Carter.

14.     This relationship has been enormously profitable for Carter Bank.  Over the duration of the relationship, the Justice companies have paid in excess of ███████ in loan interest and fees to Carter Bank. The Justice relationship has accounted for a substantial amount of Carter Bank's profit over this time.

15.     By the time Mr. Carter passed away, he had persuaded Governor Justice to transfer nearly all his business loans to Carter Bank.  Mr. Carter sought all of the Justice loan business

because he was supremely confident in the relationship and acknowledged the strong asset base, valuable operations, and trustworthy management.  While the pair's business relationship was expansive, so was their personal relationship.  Indeed, at the request of Mr. Carter's family, Governor Justice delivered the eulogy in memory of his long-time friend and business partner.

16.     Unfortunately, that sad day in 2017 marked a distinct turning point in the relationship between Plaintiffs and the institution that Mr. Carter left behind.  The relationship abruptly and rapidly began to deteriorate.  Following Mr. Carter's death, newcomer Litz Van Dyke and long-time Mr. Carter associate Phyllis Karavatakis took over management responsibilities as Carter Bank as Chief Executive Officer and President, respectively.  Almost immediately, Van Dyke and Karavatakis exhibited tremendous hostility toward the Justice companies and the Justices personally.  This growing hostility came notwithstanding the sterling relationship that had lasted more than 16 years between the Justices and Carter Bank, over which the Justice companies, to the bank's great profit, had never missed a payment.

17.     Rather than continuing to work with the Justices and live up to Carter Bank's mission statement, published on its website, to serve as the "lifetime financial partner for [its] customers," the bank and its principals have instead since 2017 carried out an unlawful scheme to prevent the Justices from ever fully paying off their loans, using illegal, bad-faith, and deceptive tactics to carry out their plan.  During that time, the Justices have afforded Carter Bank multiple opportunities to ███████████████████████████████.  As recently as May 2023, the Justices ████████████ to Carter Bank that would have ███████████ ███.  Carter Bank has not only ███████████████████████, but it has maliciously and unlawfully impeded ███.

## PARTIES

18.     Plaintiff James C. Justice Companies, Inc. ("JCJ"), is a Delaware corporation with its headquarters in Virginia.

19.     Plaintiff Twin Fir Estates, LLC, is a Virginia limited liability company with its headquarters and principal place of business in Virginia.

20.     Plaintiff Wilcox Industries, Inc., is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

21.     Plaintiff JLSM, is a West Virginia corporation with its headquarters in Virginia and principal place of business in West Virginia.

22.     Plaintiff Greenbrier Hotel Corporation ("GHC") is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

23.     Plaintiff Players Club, LLC is a Delaware limited liability company with its headquarters and principal place of business in West Virginia.

24.     Plaintiff Justice Family Group, LLC, is a Delaware limited liability company with its headquarters and principal place of business in West Virginia.

25.     Plaintiff Greenbrier Medical Institute, LLC, is a West Virginia limited liability company with its headquarters and principal place of business in West Virginia.

26.     Plaintiff Greenbrier Golf & Tennis Club Corporation is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

27.     Plaintiff The Greenbrier Sporting Club Development Co., Inc., is a Delaware corporation with its headquarters and principal place of business in West Virginia.

28.     Plaintiff The Greenbrier Sporting Club, Inc., is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

29.     Plaintiff Tams Management, Inc., is a West Virginia corporation with its headquarters in Virginia and principal place of business in West Virginia.

30.     Plaintiff Bellwood Corporation is a West Virginia corporation with its headquarters and principal place of business in West Virginia.

31.     Plaintiff Oakhurst Club, LLC, is a West Virginia limited liability company with its headquarters and principal place of business in West Virginia.

32.     Plaintiff James C. Justice, II, is the Governor and a citizen of West Virginia.

33.     Plaintiff Cathy L. Justice is a citizen of West Virginia.

34.     Plaintiff Jay Justice is a citizen of Virginia.

35.     Defendant Carter Bank & Trust is a Virginia banking institution with its principal place of business in Virginia.

36.     Defendant Carter Bankshares, Inc., is a Virginia corporation with its principal place of business in Virginia.  Together with Carter Bank & Trust, they are "Carter Bank."

37.     Defendant Litz H. Van Dyke is a member of the Board of Directors of Defendant Carter Bank & Trust and of Defendant Carter Bankshares, Inc., serving in addition as the Chief Executive Officer of both Entities.

38.     Defendant Phyllis Q. Karavatakis is a member of the Board of Directors of Defendant Carter Bank & Trust and of Defendant Carter Bankshares, Inc., serving in addition as a Senior Vice President of Defendant Carter Bank & Trust.

39.     Defendants Michael R. Bird, Kevin S. Bloomfield, Robert Bolton, Gregory W. Feldmann, James W. Haskins, Jacob A. Lutz, III, E. Warren Matthews, Catharine L. Midkiff, Curtis E. Stephens, and Elizabeth Lester Walsh are members of the Board of Directors of Defendant Carter Bank & Trust, and each is also a member of the Board of Directors of Defendant

Carter Bankshares, Inc.  Together with Defendants Van Dyke and Karavatakis, they are the "Director Defendants." Upon information and belief, the Director Defendants have approved and directed the conduct of Carter Bank alleged herein, including, but not limited to, the efforts to exercise control over Plaintiffs' businesses and to block Plaintiffs from doing business with other lenders.

## JURISDICTION AND VENUE

40.     Jurisdiction lies in this Court in accordance with 28 U.S.C. § 1331, in that Plaintiffs have alleged Defendants violated 12 U.S.C. § 1972, thus presenting a federal question.

41.     This Court, pursuant to 28 U.S.C. § 1367(a), may exercise supplemental jurisdiction over Plaintiffs' claims insofar as they arise under state law, as those pendant claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy.

42.     Venue in this Court conforms with the requirements of 28 U.S.C. § 1391(b)(2), in that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Southern District of West Virginia.  To illustrate in part, essentially all of the collateral securing the Carter Bank loans, together with nearly all the operations associated with that collateral are located in the Southern District of West Virginia.  Moreover, venue is proper in conformance with 12 U.S.C. § 1975, as Defendants have one or more agents within the Southern District of West Virginia.

## FACTUAL BACKGROUND
### *Background of Plaintiffs and their Businesses*

43.     Greenbrier Hotel Corp., Players Club, LLC, Greenbrier Golf & Tennis Club Corp., Greenbrier Medical Institute, LLC, The Greenbrier Sporting Club, Inc., Justice Family Group,

LLC, Oakhurst Club, LLC and The Greenbrier Sporting Club Development Company, Inc. (together, the "Greenbrier Entities") are engaged in the business of hospitality.  The Greenbrier Entities service, own, and operate Greenbrier Resort located in White Sulphur Springs, West Virginia.  The resort includes golf and tennis facilities, a spa, dining, a casino, along with a medical clinic. The Greenbrier Entities are one of West Virginia's largest employers.

44.     Tams Management, Inc. and JLSM (together, the "Mining Entities") are engaged in the business of mining and processing high quality metallurgical coal, principally in the state of West Virginia near the cities of Beckley and Bluefield.

45.     Bellwood Corp. is a resource and land company, with all assets located in the state of  West Virginia, in the counties of Monroe, Fayette and Greenbrier.

46.     JCJ is a real estate holding company, with the majority of its assets in West Virginia.

47.     Twin Fir Estates, LLC, is a real estate holding company  with all assets previously located in the state of Virginia, in Floyd County.  These assets were sold in 2022 with all net proceeds going to Carter Bank.

48.     Wilcox Industries, Inc., is a resource and land holding company, with all assets located in West Virginia in the counties of Raleigh and Summers.

### *Mr. Carter and Governor Justice Grow their Businesses Together and Establish a Relationship of Trust and Respect*

49.     Governor Justice's and Mr. Carter's commercial relationship began with an initial real estate loan of approximately $4.5 million in 2001.  Shortly thereafter, Mr. Carter raised with Governor Justice his interest in growing the lending relationship and exploring larger long-term commercial lending opportunities.   Mr. Carter wanted to build his business with the Justices; he

had concluded that loans to Justice-owned companies would be backed by strong assets, supported by valuable operations, secured by desirable collateral, and run by people he could trust. The predecessors to Carter Bank entered into their first coal-related loan to a Justice-owned entity in West Virginia (Dynamic Energy, Inc.) for approximately $12 million.

50.     By 2008, Carter Bank's commercial loan portfolio with the Justice companies contained over $75 million in long-term loans across agricultural, real estate, and coal mining operations with loan terms of typically 4% to 5% interest amortizing over 20 years. Mr. Carter took a personal approach with the Justice companies; he personally visited all the loan collateral properties.

51.     In 2008 and 2009, the Justice family sold certain coal mining operations in West Virginia and deposited several hundred million dollars of those sale proceeds at Carter Bank. These deposits produced significant income for Carter Bank and at the time, accounted for the majority of the bank's net income. Shortly thereafter, Governor Justice and the Justice Family Group, LLC, purchased The Greenbrier Resort, a United States historic landmark resort in White Sulphur Springs, West Virginia. As Governor Justice began to invest in The Greenbrier's restoration, Mr. Carter urged the Justice Family Group, LLC, to borrow approximately $50 million from Carter Bank instead of using cash on hand to facilitate those efforts. Governor Justice accepted Mr. Carter's proposal, with the result that Carter Bank retained the large deposits from the aforementioned coal mining sale and received the profit from the difference between the interest rate on the loan and the interest rate on the deposits. Again, Mr. Carter extended the Justice companies 4% to 5% interest rate terms, with the loan obligations amortizing over 20 years and a final payoff in 2028.

52.     In 2011, Governor Justice sought to expand his agriculture operations and purchase

large amounts of farmland in Western Kentucky as well as in the Carolinas.  Rather than using available cash on hand at Carter Bank, Mr. Carter again suggested that the bank lend the funds to purchase the farmland on favorable terms, permitting the bank to keep the cash on hand from the sale of the coal mining operation in West Virginia and to continue to hold the deposits, thus receiving the profit from the difference in interest rates.  By the end of 2011, Carter Bank secured commercial loan agreements with the Justice companies totaling over $170 million.

### *Expansion of the Relationship between Carter Bank and the Justice Companies*

53.     From 2012 through 2016, there was substantial disruption in the coal industry. Many coal mining companies in the United States were forced to file for bankruptcy.  The Mining Entities, while less exposed to the weak thermal coal market, nonetheless experienced substantial losses.  During this period, Mr. Carter approached the Justices about lending additional funds to the Justice companies, in particular the coal companies, in large part to help keep the Mining Entities out of bankruptcy.  Mr. Carter did not want the Mining Entities to file for bankruptcy because he believed that would destroy Carter Bank.  Mr. Carter was very clear that Carter Bank would lend additional funds to the Justice companies to cover operating losses to weather what was hoped to be a temporary decline in the coal industry.

54.     From 2014 through 2015, Carter Bank, at the direction of Mr. Carter, provided additional loans to the Mining Entities to fund operating losses and to refinance other debts of the Justice coal entities, such as equipment loans that had previously been financed with Caterpillar Financial.  At Mr. Carter's suggestion, the Plaintiffs used proceeds from the Carter Bank loans to pay off other short-term lenders to take advantage of the favorable long-term 20-year amortization terms Carter Bank was able to provide.  By the end of 2015, Carter Bank lending to the Justice companies totaled approximately $650 million.

55.     During 2016 Carter Bank lent the Justice companies additional sums totaling approximately $130 million, which were primarily used to fund the Justices' reacquisition and rehabilitation of the Bluestone Coal mining operations in West Virginia from Russian mining company Mechel OAO.  The reacquisition of Bluestone was a monumental undertaking that provided a vital lifeline to many West Virginia vendors, suppliers, the West Virginia Department of Environmental Protection, the West Virginia Tax Department, and hundreds of UMWA coal miners that were abandoned by the defunct Russian company. By the end of 2016 Carter Bank has lent to the Justice companies a total of $775 million.

56.     By early 2017, the Justice companies had paid down the outstanding Carter Bank debt by about $35 million with profits realized from the uptick in coal pricing that the parties had correctly forecast.  By the time Mr. Carter died on April 7, 2017, the Justices had paid the Carter debt down to $740 million.

### After Mr. Carter Passes Away, Carter Bank Upends the Good-Faith Relationship, Plotting a Course of Deception, Bad Faith, and Misconduct.

57.     On April 7, 2017, Mr. Carter passed away, leaving a legacy of close-knit, trust-based banking relationships.  Van Dyke and Karavatakis formally took over management of Carter Bank.

58.     In or around May 2017, Carter's new management abruptly reneged on an agreement with Plaintiff Oakhurst to fully finance a $64 million golf and residential development. In or around October 2015, Carter and Oakhurst had entered into an agreement under which Carter would lend Oakhurst up to $64 million to develop a world-class golf course project. The centerpiece of the project was a golf course designed by golf legends Jack Nicklaus, Arnold Palmer, Gary Player, and Lee Trevino—the only course in the world on which all four designers

had collaborated. The project was to include 330 lots surrounding the course, which were expected to sell for a total of approximately $146.8 million.

59.     When Carter breached its agreement to fund the project, Oakhurst had already drawn down approximately $26 million of the promised funds from Carter and used those funds to complete the project's initial phases. Carter's breach made it impossible for Oakhurst to complete the project or to generate any revenue to pay off the $26 million already borrowed. The effect—and, upon information and belief, the intent of Defendants Carter, Carter Bankshares, and Van Dyke—was to ensure that Carter would continue to receive interest on the loan indefinitely.

60.     On or about September 7, 2017, Jay Justice met with Van Dyke, Karavatakis and Carter Bank's attorney.  Carter Bank's attorney began the meeting by threatening to take everything the Justices owned.  Jay Justice then requested (i) a loan from Carter Bank for approximately $10 million to bring certain coal mining operations back into production to increase their value for a potential sale and (ii) that the monthly $1.9 million in payments due on coal loans associated with these Entities be deferred for several months to facilitate the sale, with the deferred payments being added to the end of the corresponding notes.  At the meeting, the bank officials agreed to the proposal and committed to formally documenting the deal in short order.

61.     Between September 7, 2017 and October 1, 2017, Van Dyke, Karavatakis, and Defendants' attorneys repeatedly confirmed to Jay Justice and lawyers for Plaintiffs that Plaintiffs' September 7th requests were granted, and in accordance therewith, repeatedly instructed the Justice companies and their attorneys to not make the corresponding payments for the coal loans because those loans were effectively, for all intents and purposes, extended.

62.     Just days before the payments were to come due, however, Carter cut off all communication with Plaintiffs.  Plaintiffs repeatedly tried to contact Van Dyke, Karavatakis, and

Carter Bank's attorneys.  The phone calls went unanswered, voicemails were never returned, emails were ignored, and pleas for an explanation as to why the repayment extension and $10 million additional loan were not being finalized ahead of the deadline fell on deaf ears.  The mutually beneficial, trust-based relationship with the late Mr. Carter in helping Plaintiffs weather tough times was unexpectedly replaced with the cold silence of the new Carter Bank.

63.     On October 3, 2017, Carter Bank sprang its trap. Carter Bank sent Plaintiffs several notices of defaults, accelerating nearly $268 million in what had been 20-year debt obligations, demanding repayment within ten days.

64.     Armed with this "default," manufactured by its own deception, Carter Bank refused to give Plaintiffs an opportunity to cure.  Instead, the following day, October 4, 2017, Carter Bank sent Plaintiffs a demand requiring that Plaintiffs agree to (i) the addition of cross-default provisions with respect to some of the Carter Bank loans to Plaintiffs, (ii) cross-collateralization of all the loans, (iii) additional guarantees, (iv) acceleration provisions, and (v) delivery of sweeping release and reaffirmation agreements.  Moreover, Carter Bank required that certain loans undergo wholesale alterations from long-term 20-year notes to various forms of extremely short-term notes, including in some instances demand notes.  In addition, Carter Bank obtained for itself full access to Plaintiffs' books and records, the right to receive all information with respect to potential alternative financing sources and proposals, and the right to be paid from the proceeds of a sale of assets by Justice-owned entities that were not obligors, guarantors, or pledgors of any Carter Bank debt.

65.     These demands put Plaintiffs between a rock and a hard place.  Facing an acceleration of over $200 million in debt as a result of the technical default and fearful of alienating their near-exclusive financing provider, Plaintiffs had no choice but to acquiesce to the oppressive

demands.  The parties' two-decade long relationship was fundamentally changed in the matter of a few days, all for failure to pay a $1.9 million loan payment (less than 1% of the outstanding $269 million in corresponding debt), which failure was precipitated by the deception of Van Dyke and Karavatakis.  Under the severe duress caused by Defendants' tortious, surprising, and unfair conduct, and with no other option available within such a short time period, Plaintiffs (and the Justices) had no choice but to execute every security pledge, forbearance agreement, guarantee, and release that Carter Bank demanded from them.  Carter Bank's deceptive treatment had succeeded.  After pulling the rug of trust and confidence right out from under Plaintiffs, Defendants had the ultimate upper hand.

### *Defendants' Bad Faith Continues*

66.    Between November 2017 and May 2021, Defendants demanded and obtained three separate Forbearance Agreements and eleven separate Release and Reaffirmation Agreements from Plaintiffs, which collectively provided Carter Bank with additional cross-collateralization, waivers of cure periods, rights to attorneys' fees, and the inevitable releases.  Every time a new three- or six-month debt payment due date rolled around, Plaintiffs were forced to renegotiate and comply.  Never once in that period, however, did Plaintiffs miss a payment to Carter Bank other than the single $1.9 million missed payment in October 2017 that was precipitated by Carter Bank's own tortious actions.

67.    After the tortious scheme that resulted in the initial Forbearance Agreements and corresponding Release and Reaffirmation Agreement in November 2017, Defendants continued the scheme by following the same pattern of tortious conduct:

- Carter Bank would wait until a note that was converted under duress from a 20-year term to a three-month to six-month term was coming due.

- Armed with the cross-default, cross-collateralization, guarantees, waivers, and releases obtained through its tortious conduct in October 2017, Defendants would leave a previously agreed-upon loan extension on the now-converted short-term note in abeyance until after the quarter close.

- Instead of facilitating the agreed-upon loan extension on the converted short-term note at issue, Carter Bank would issue or threaten to issue a default notice and commence foreclosure proceedings across the now cross-collateralized assets unless the Plaintiffs agreed to additional concessions, including more cross-collateralization, additional guarantees, and the inevitable releases.

68. For example, in September 2018, Defendant Carter Bank refused to release collateral in connection with a payoff of debt of one of the Justices' coal businesses, Bluestone Resources Inc.

69. The following year, Defendants struck again. JLSM had a line of credit with a $4 million balance that was coming due, based on the newly demanded three- to six-month short-term due dates, on March 31, 2019. At the time, the coal industry had rebounded to some degree. Accordingly, in or around March 2019, JLSM requested a short-term loan of $10 million from Carter Bank to bring those mining operations into production to prepare them for sale. JLSM simultaneously requested an extension of the $4 million line of credit that was coming due for the same property.

70. Carter Bank extended the line of credit until July 31, 2019, agreeing to lend JLSM the $10 million it requested. However, the deception was soon deployed again.

71. Despite JLSM's repeated attempts to contact Van Dyke and Karavatakis to close the new loan and further extend the line of credit, Carter Bank would not return any of the JLSM's

calls, emails, or texts.  Finally, on the last business day of July 2019, after both Van Dyke and Karavatakis dodged JLSM's calls throughout the day, and after Van Dyke's secretary confirmed that neither of them intended to return JLSM's calls, the Plaintiffs were left with no choice.

72.     This time Plaintiffs refused to accept Defendants' deceptive practices. Rather than allowing the $4 million line of credit to go into default, which would have triggered all the cross-default and cross-collateralization obtained by Defendants in Fall 2017, the Plaintiffs paid the $4 million balance, closing the line of credit and thereby significantly diminishing their available cash.

73.     If it was not already clear that Defendants were avoiding Plaintiffs' calls to manufacture a default in furtherance of their unfair scheme, it became crystal clear once Plaintiffs thwarted the Defendants' efforts to manufacture another default.  Within minutes of payment, Carter Bank's attorney sent Plaintiffs an email indicating he was "putting his pencil down" on the line of credit extension.  After ignoring Plaintiffs' repeated requests all day, suddenly an immediate response arrived.  These were no cases of missed connections — these were bad-faith acts by Defendants.

74.     Shortly after this episode of egregious, deceptive behavior, Defendants began refusing to engage at any level with Plaintiffs unless they adhered to a new "communication protocol," requiring all communication whatsoever to occur only from attorney-to-attorney, and then only through means of written letters meeting certain criteria.  This protocol was a mechanism by which Defendants hid from their duties and concealed their unfair behavior.

75.     The following year, Defendants once again engaged in the same bad-faith practices that have become their standard operating procedure since 2017.  In or around 2018, Defendants forced Plaintiffs to convert a $51.7 million loan to JCJ from a 20-year note to a demand note.

19

76.     In or around January 2020, Carter Bank refused to provide a release of insurance proceeds Plaintiff Greenbrier Hotel Corporation received from a damaging 2016 flood to the property.  When Plaintiffs requested the reason for Carter Bank's refusal, the bank refused to engage or give any explanation for its behavior.  Carter Bank routinely denied similar reasonable requests from Plaintiffs, including, but not limited to, requests for basic portfolio information, such as outstanding loan balances and amounts of payments due.

77.     Early in 2021, the Greenbrier Entities began exploring potential replacement financing for the Carter Bank debt with a new lender.  As those efforts progressed, the Greenbrier Entities attempted to engage Carter Bank to discuss the repayment of the obligations.  However, consistent with their prior practice, Defendants refused to engage at any level, resorting to hiding behind their "communication protocol."  And even when letters were sent according to the protocol, Defendants refused to engage in any substantive discussion.  Carter Bank also asked for a Release and Reaffirmation Agreement to be signed as a *precondition* to merely having discussions, without regard to whether a transaction would occur.  Most egregiously, Defendants refused any discussion with Plaintiffs even in the immediate lead-up to the June 1, 2021 repayment date.  As the deadline approached, the Greenbrier Entities informed Carter Bank that they were in the final stages of securing replacement financing from a new lender for the repayment of all their loans, and that the bank's refusal to engage jeopardized the refinancing deal.

78.     On May 29, 2021, prompted by the months-long stonewalling by Carter Bank, its management, and the bank's counsel, Jay Justice sent a final, good faith letter to the bank's Board of Directors, requesting an emergency meeting in advance of the quickly approaching June 1 deadline.  This good-faith letter was likewise ignored by Defendants.

*Defendants' Continued Scheme*

79.     As a result of the unlawful and tortious conduct described above, Plaintiffs were forced in May 2021 to sue Carter Bank and its officers and directors for their egregious misconduct.  That case was settled in early September 2021, but Defendants' tortious and unlawful behavior not only continued unabated but in fact worsened.  Since the settlement, Defendants have continued their predatory scheme to perpetuate the flow of interest payments from Plaintiffs to Carter Bank by making it impossible for Plaintiffs to ever pay off their loans. Defendants have continued to demand extreme terms intended to hobble Plaintiffs' business operations and prevent repayment, including, without limitation, ██████████████████████████████████ ██████████████████████████████████. They have continued their   practice   of  ██████████████████████████████████ ██████████.   Defendants  have  continued  to  demand  ████████████████████ ██████████████████████████████████ ████████████████████.  Defendants  have  continued  to  ████████████████████ ██████████████████████.  And  they  have  continued  to  unlawfully  prevent Plaintiffs from ██████████████████████████████████ ████████████████████.

80.     Since August 2021, Defendants have routinely ████████████████████ ██████████████████████████████. These ████████████████████ deprive Plaintiffs of the stability that is required to operate any business, let alone businesses as large and complex as Plaintiffs'.  The ████████████████ are intended to allow Defendants to control Plaintiffs' businesses, and to prevent Plaintiffs from generating sufficient revenue to pay off their loans and end that control.

81.     Since August 2021, Defendants have repeatedly used their control over Plaintiffs to force Plaintiffs to ██████████████████████████████████████████ ████████ that are intended to prevent Plaintiffs from paying off their loans, along with ████████ ████████████████ immunize Defendants from the consequences of their unlawful conduct.

82.     Since August 2021, Plaintiffs have offered Carter Bank ████████████████ ████████████████████████████████████████████████████ ██████████████████████. Defendants ████████████████████████ in order to maintain their control over Plaintiffs' businesses and the stream of interest payments from Plaintiffs on which Carter Bank depends.

83.     In October 2022, Plaintiffs █████████████████████████████ ████████████████████████████████████. Under either of those ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████. ██████████████████████████████ ████████████████████████████ Plaintiffs would have enjoyed tens of millions of dollars in annual savings ████████████████████████████ ████, totaling more than $100 million in savings ████████████████████.

84.     On December 30, 2022, Plaintiffs ██████████████████████ ████████████████████████████████████████████████████ ██████████████████████. ████████████████████████████████ ██████████████████████████████ would have generated tens of millions of dollars in annual profits and positioned JLSM for a lucrative sale, particularly given the high price of metallurgical coal during the relevant time period. ██████████████████

████████████████████████████████████████████████. Defendants

██████████████████████████, leaving JLSM's Bishop mine idled and depriving

Plaintiffs of the profits and sale proceeds ████████████████████████.

85.    On January 30, 2023, Plaintiffs ███████████████████████████████

████████████████████████████. Plaintiffs also ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████. Defendants ████████████████████, reaffirming their control over

Plaintiffs' day-to-day business operations. Defendants' ████████████████████ left the Bishop

mine idled and deprived Plaintiffs of the profits and sale proceeds ████████████████████

██████.

86.    On February 1, 2023, Defendants ████████████████████████████████

████████████████████████████████████.

87.    On March 23, 2023, Defendants ████████████████████████████████

████████████████████████████████████████████████████████████

██████. Defendants knew that this ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████.

88.    On March 25, 2023, Plaintiffs ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████. Plaintiffs' ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████.

89.    Carter Bank did not ████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████.

90.    On April 2, 2023, Plaintiffs ████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████. Upon information and belief, Defendants did so for the purpose of destroying ██

████████████████████ and perpetuating their interest income from Plaintiffs.

91.    Beginning April 4, 2023, Plaintiffs ████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████. Plaintiffs also



92.     On April 13, 2023, Plaintiffs ███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████.

93.     On April 15, 2023, ████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████.

94.     On April 21, 2023, Defendants obtained confessed judgments against Governor Justice, Cathy Justice, and Jay Justice in the Circuit Court of Martinsville, Virginia, based on those individuals' personal guaranties of Plaintiffs' loans.  Defendants knew or should have known that this action would risk destroying ███████████████████, and, upon information and belief, Defendants took this action for the purposes of ████████████████ and of damaging Plaintiffs businesses and reputations.  Among other things, the confessed judgments obtained by Defendants included a claim for 16.5% default interest and ***more than $6 million in attorney fees for Carter Bank***, allegedly as the result of a default that had occurred ***less than one week earlier***.

95.     That same day, April 21, 2023, Plaintiffs █████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████. Carter Bank nonetheless subsequently sued Jay Justice for purportedly violating its communication protocol, which Defendants have sought to impose so that they can commit tortious and unlawful acts in secret, and attack Plaintiffs' businesses and reputations with impunity. Upon information and belief, Defendants filed that

action for the purposes of concealing their misconduct, gaining bargaining power in negotiations regarding Plaintiffs' loans, and destroying ███████████████████████████.

96.     Despite Defendants' malicious conduct, Plaintiffs continued to seek an avenue to resolve the matter without resort to further litigation.  Plaintiffs were able to ███████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████.

97.     On April 27, 2023, Carter Bank █████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████.

98.     On May 3, 2023, however, Carter Bank ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████ Defendants knew or should have known that this action would ███████ ████████████████████████, and, upon information and belief, Defendants took this action for the purpose of █████████████████████.

99.     On May 10, 2023, the ███████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ Defendants thus succeeded once again in their unlawful

26

scheme to prevent Plaintiffs from paying off their loans and from doing business with other lenders, and to perpetuate forever their stream of interest income from Plaintiffs.

100.    Defendants' predatory, unlawful conduct has caused, and will continue to cause, enormous past and future damages to Plaintiffs.

101.    Faced with Defendants' bad-faith conduct, Plaintiffs have no choice but to bring this lawsuit to remedy the ongoing and future harm to their businesses that Defendants have caused.  Defendants have violated clear federal prohibitions against imposing anticompetitive exclusivity requirements for banking services, contrary to the obligations of a bank to engage in good faith and honest dealing with its customers.

**COUNT ONE**
**VIOLATION OF THE**
**BANK HOLDING COMPANY ACT**
**(All Defendants)**

102.    Plaintiffs incorporate the allegations of Paragraphs 1-101, *supra*, as if fully set forth herein.

103.    The Bank Holding Company Act of 1956, 12 U.S.C. § 1841 *et seq.*, contains "anti-tying" provisions designed to prevent anticompetitive behavior by banking organizations.  In particular, banks are prohibited from extending credit on the condition or requirement that the customer not obtain other credit from a competitor.  *See* 12 U.S.C. § 1972(1)(E).

104.    The Fourth Circuit recognizes that the anti-tying provisions must be construed broadly in furtherance of their purpose "to prohibit anti-competitive [banking] practices which require bank customers to accept or provide some other service or product or refrain from dealing with other parties in order to obtain the bank product or service that they desire." *Lancianese* v.

27

*Bank of Mount Hope*, 783 F.2d 467, 469 (4th Cir. 1986) (citing S. Rep. No. 1084, 91st Cong. 2d Sess. (1970)).

105.    The district court in *McCune* v. *National City Bank,* 701 F. Supp. 2d 797 (E.D. Va. 2010), squarely held that the exclusivity provision of § 1972(1)(E) applies to restrictions on borrowings from another lender under circumstances similar to Defendants' conduct in this case, as they prevented Plaintiffs from refinancing existing debt.  The court in *McCune* found that a bank's refusal to entertain a request by an existing borrower for permission to refinance more senior debt was properly subject to review under the Bank Holding Company Act's exclusivity prohibition because: (i) the refinancing represented an "extension of credit"; and (ii) the bank's policy disallowing the subordination of mortgages in favor of modified senior debt amounted to, in effect, lending conditions on the customer's agreement not to purchase a second product from a competitor.  *See* 701 F. Supp. 2d at 802.

106.    The holding in *McCune* is consistent with the legislative history of the exclusivity provision, which, as summarized in a Senate Report, "insures that . . . agreements [related to extensions of credit] may not be tied to or conditioned upon an agreement not to do business with competitors of subsidiaries of the bank holding company, the bank, or of the operators of the bank." S. Rep. No. 1084, 91st Cong. 2d Sess. (1970).

107.    Plaintiffs'   necessarily gave Defendants the opportunity to exercise economic leverage and engage in anticompetitive practices. Moreover, Defendants' ███████████████████████. Thus, the ████████████ involved a credit-based interaction under circumstances that the Bank Holding Company Act is intended to regulate.

28

108.   Through the misconduct alleged above, Defendants have engaged in a patently illegal effort to ████████████████████.

109.   Upon information and belief, the Director Defendants knew of, approved, and directed Carter Bank's misconduct.  The Director Defendants are liable to Plaintiffs for having caused, aided, and abetted Carter Bank's violations of federal law.

110.   Carter Bank's efforts to frustrate repayment are primarily motivated by an effort to preserve an interest stream of ████████████████████████████ ██████████████████████.

111.   Defendants' violations of federal law have caused Plaintiffs significant damages, including without limitation business disruption, loss of business reputation, excessive fees and interest, the costs incurred in ████████████████████, together with attorney fees and litigation costs.  Defendants are liable to Plaintiffs in an amount to be proven at trial, which shall be trebled in accordance with 12 U.S.C. § 1975.

## COUNT TWO
## BREACH OF CONTRACT
### (Defendants Carter Bank & Trust and
### Carter Bankshares, Inc.)

112.   Plaintiffs incorporate the allegations of Paragraphs 1–111, *supra*, as if fully set forth herein.

113.   Plaintiffs ████████████████████████████████ ████████████████████████████████████ ████████████████████

114.   Under Virginia law, every contract embraces an implied covenant of good faith and fair dealing.  There are two ways that a party can breach this implied covenant: (1) by acting

29

dishonestly in the exercise of a contract right, or (2) by acting arbitrarily or unfairly in the exercise of contractual discretion. The implied covenant prohibits a party from exercising contractual discretion in bad faith even when such discretion is vested solely in that party.

115. Carter Bank has acted dishonestly and in bad faith with respect to ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ .

116. The conduct alleged above — ████████████████████████████████ ███████████████████████████████████████████████████ —

demonstrates that Carter Bank has acted arbitrarily, unfairly, and in bad faith.

117. Consequently, Carter Bank has breached the implied covenant of good faith and fair dealing in the execution of its contractual rights and obligations.

118. Carter Bank's breach of contract has caused Plaintiffs significant direct and consequential damages, including without limitation business disruption, loss of business reputation, excessive fees and interest, the costs incurred in ███████████████████ ███████████ together with attorney fees and litigation costs, for which it is liable to Plaintiffs for damages in an amount to be proved at trial.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTY**
**(All Defendants)**

119. Plaintiffs incorporate the allegations of Paragraphs 1–118, *supra*, as if fully set forth herein.

120. Under West Virginia law, a special relationship —and thus, a fiduciary duty — arises in the context of a lender-borrower relationship when the relationship extends beyond the traditional role of a lender with respect to the borrower.

121.     Under Virginia law, a fiduciary relationship arises between a borrower and lender if the lender exercises substantial control over the borrower's business affairs.  More generally, a fiduciary relationship exists under Virginia law in all cases where special confidence has been reposed in one who in equity and good conscience is bound to act in good faith and with due regard for the interests of the one reposing the confidence.

122.     The relationship between Plaintiffs and Carter Bank is one of special confidence that goes beyond a normal borrower-lender relationship.  Beyond simply financing loans to the Plaintiffs, Carter Bank operated as Plaintiffs' de facto partner, involving itself in operational decisions and exercising control over elements of Plaintiffs' business.  Mr. Carter worked closely with the Justices and their businesses over the course of more than a decade, helping them make decisions regarding capital improvements, acquisitions, and divestitures, and advising them on financing mechanisms involving cash or debt.  Plaintiffs frequently consulted Carter Bank before making business decisions, and Mr. Carter frequently initiated business arrangements.  When Plaintiffs' coal mining businesses struggled in an underperforming coal market in 2012, Carter Bank encouraged Plaintiffs not to sell those businesses or file for bankruptcy and instead offered to finance additional loans.  Deals between Plaintiffs and Defendants were routinely made on handshakes, an arrangement made possible only through the special confidence that Plaintiffs had reposed in Defendants.

123.     Defendants willfully and intentionally breached their fiduciary duties to Plaintiffs by declaring that Carter Bank would ████████████████████████████████████████ ████████████████████████████.

31

124.    Upon information and belief, the Director Defendants knew of, approved, and directed Carter Bank's misconduct.  The Director Defendants are liable to Plaintiffs for having caused, aided, and abetted Carter Bank's violations of federal law.

125.    Defendants' breaches of their fiduciary duty to Plaintiffs have caused Plaintiffs significant damages, including without limitation business disruption, loss of business reputation, excessive fees and interest, the costs incurred in ███████████████████████, and attorney fees and litigation costs, for which Defendants are liable to Plaintiffs for damages in an amount to be proved at trial.  Moreover, Defendants' misconduct was malicious, oppressive, wanton, willful, or reckless, necessitating an award of punitive damages.

### COUNT FOUR
### TORTIOUS INTERFERENCE WITH
### BUSINESS RELATIONS
### (All Defendants)

126.    Plaintiffs incorporate the allegations of Paragraphs 1–125, *supra*, as if fully set forth herein.

127.    Under West Virginia law, where a party outside of a business relationship or expectancy intentionally interferes with that relationship or expectancy and causes harm, that party is liable in tort.

128.    Carter Bank was not a party to the business expectancy and developing relationship between ████████████████████.  Nonetheless, motivated by profit, the bank intentionally and wrongfully interfered with Plaintiffs' business expectancy and relationship by refusing, without legitimate justification, to ██████████████████████████ ██████

129.    Upon information and belief, the Director Defendants knew of, approved, and directed Carter Bank's misconduct.  The Director Defendants are liable to Plaintiffs for having caused, aided, and abetted Carter Bank's violations of federal law.

130.    Defendants' tortious interference with Plaintiffs' business relations has caused Plaintiffs significant damages, including without limitation business disruption, loss of business reputation, excessive fees and interest, the ███████████████████████████████ ██████, together with attorney fees and litigation costs, for which it is liable to Plaintiffs for damages in an amount to be proved at trial.  Moreover, Defendants' misconduct was sufficiently malicious, oppressive, wanton, willful, or reckless as to justify an award of punitive damages.

## COUNT FIVE
## DECLARATORY JUDGMENT
### (Defendants Carter Bank & Trust and
### Carter Bankshares, Inc.)

131.    Plaintiffs incorporate the allegations of Paragraphs 1–130, *supra*, as if fully set forth herein.

132.    Plaintiffs request declaratory relief pursuant to 28 U.S.C. § 2201, which confers on federal courts the authority "to declare rights, status and other legal relations whether or not further relief is or could be claimed," further noting that "no action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for."

133.    In conjunction with the subject loans, Carter Bank ████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████.

134.    The confessions of judgment violate due process in that they allow Defendants to obtain judgments without affording Plaintiffs an adequate opportunity to present their valid defenses.  The confessions should therefore be declared void as contrary to public policy.

135.    Apart from the trampling of their due process rights by virtue of the confessions of judgment, the guarantors' principal purpose in guaranteeing the loans was frustrated by Carter Bank's unlawful declaration that it would ███████████████████████████████████ ██████████████████████.  The doctrine of discharge by supervening frustration therefore requires that the guaranties be declared void and unenforceable.

136.    Moreover, Carter Bank's unlawful misconduct substantially, materially, and detrimentally modified the guarantors' obligations and duties in connection with the loans.  The principle of discharge by alteration therefore requires that the guaranties be declared void and unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this honorable Court enter judgment for them and against Defendants, affording them the following relief:

a.    A declaratory judgment in their favor;

b.    An award of direct and consequential damages of not less than $1 billion upon trebling in accordance with 12 U.S.C. § 1975;

c.    An award of punitive damages as permitted by law;

d.    An award of costs, interest, expenses, and attorney fees;

e.    Prejudgment and post-judgment interest on Plaintiffs' damages as permitted by law; and

f.    Such other relief as the Court may, under the circumstances, deem just and proper.

**PLAINTIFFS DEMAND A TRIAL BY JURY
ON ALL ISSUES SO TRIABLE.**

DATED:        November 10, 2023

Respectfully submitted,

GREENBRIER HOTEL CORPORATION
JAMES C. JUSTICE COMPANIES, INC.
TWIN FIR ESTATES, LLC
WILCOX INDUSTRIES, INC.
JUSTICE LOW SEAM MINING, INC.
PLAYERS CLUB, LLC
JUSTICE FAMILY GROUP, LLC
GREENBRIER MEDICAL INSTITUTE, LLC
GREENBRIER GOLF & TENNIS CLUB CORPORATION
THE GREENBRIER SPORTING CLUB DEVELOPMENT CO.,
INC. THE GREENBRIER SPORTING CLUB, INC.
TAMS MANAGEMENT, INC.
BELLWOOD CORPORATION
OAKHURST CLUB, LLC
JAMES C. JUSTICE, II
CATHY L. JUSTICE
JAMES C. JUSTICE, III

By Counsel:

*/s/ Steven R. Ruby*
Michael W. Carey (WVSB #635)
Steven R. Ruby (WVSB #10752)
Raymond S. Franks II (WVSB #6523)
David R. Pogue (WVSB #10806)
CAREY DOUGLAS KESSLER & RUBY PLLC
901 Chase Tower, 707 Virginia Street, East
P.O. Box 913
Charleston, WV 25323
Telephone: (304) 345-1234
Facsimile:  (304) 342-1105
mwcarey@csdlawfirm.com
sruby@cdkrlaw.com
rfranks@cdkrlaw.com
drpogue@cdkrlaw.com

*Counsel for Plaintiffs*